IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2007

## MARTINO WRIGHT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-08614    Paula Skahan, Judge**

**No. W2006-02342-CCA-R3-PC  - Filed January 9, 2008**

The petitioner, Martino Wright, pled guilty to two counts of especially aggravated robbery and received a total effective sentence of thirteen and one-half years incarceration in the Tennessee Department of Correction. Thereafter, he filed a petition for post-conviction relief, alleging that his counsel were ineffective and that as a result of a multitude of errors his guilty plea was not a knowing and voluntary choice. The post-conviction court denied the petition, and the petitioner timely appealed. Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

David Christensen, Memphis, Tennessee, for the appellant, Martino Wright.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The record reflects that on June 24, 2002, when the petitioner was fifteen years old, he was charged with the especially aggravated robbery of Rudolph Ross and Mary Ross. Counsel was appointed (hereinafter "juvenile counsel"), and a hearing was conducted to determine whether the petitioner should be tried as an adult. On July 3, 2002, the juvenile court issued an order transferring the petitioner to criminal court. In the order, the juvenile court found that the petitioner committed the delinquent acts charged, he was "not committable to an institution for the mentally retarded or

mentally ill," and "[t]he interests of the community require[d] that said child be placed under legal restraint or discipline."

After the petitioner was transferred to criminal court, he was appointed counsel (hereinafter "trial counsel"). On the day of trial, the petitioner, facing two counts of especially aggravated robbery, pled guilty to both counts in exchange for concurrent sentences of thirteen and one-half years incarceration with release eligibility after service of one hundred percent of the sentences.

Thereafter, the petitioner filed a petition for post-conviction relief, alleging that his juvenile counsel and trial counsel were ineffective.[1] In his petition, the petitioner alleged that his counsel were ineffective by (1) failing to adduce sufficient proof of his mental retardation to prevent his case from being transferred from juvenile court, (2) erroneously advising him that he could not testify at the transfer hearing, and (3) inaccurately informing him of the time he would serve in confinement prior to parole.[2]

At the post-conviction hearing, the petitioner testified that at the time of the offense he was living with his grandfather and was in the ninth grade at Booker T. Washington High School. The petitioner said that he went to school every day, but he had problems "keeping up with people." He explained that he stopped going to school because "I was intelligent but I didn't want to look like a fool by people saying, well he intelligent but he can't read or write."

The petitioner said that after juvenile counsel was appointed, she met with him only once prior to the juvenile transfer hearing. She asked him if he could read or write, and he told her that he could not. Although counsel knew that the petitioner was in "resource" classes, she never reviewed his academic records with him. The petitioner said that he did not understand what was happening at the transfer hearing. He maintained that juvenile counsel would not let him testify at the transfer hearing, even though he asked if he could say something. Initially, the petitioner said that he did not recall having been in juvenile court before the instant case; however, the petitioner subsequently conceded that he had been in juvenile court on a few occasions.

After the petitioner was transferred to criminal court, trial counsel was appointed to represent him. The petitioner said that he never "had a relationship" with trial counsel, and they met only on court dates. The petitioner stated that he tried to call trial counsel several times, but he was told that trial counsel would not accept collect calls. The petitioner testified that he asked the trial court for a new attorney, but his request was denied.

The petitioner said that he went for a mental evaluation, and he was told, "[Y]ou guilty, ain't nothing wrong with you. And I was trying to tell them ain't nothing wrong with me. You know, but,

---

[1] The original petition for post-conviction relief was filed pro se. Following the appointment of counsel, four amended petitions were filed.

[2] While the petitions alleged additional instances of ineffectiveness, these are the only complaints raised on appeal.

they was making it seem like something was wrong with me." He stated that after his evaluation he was found competent to stand trial.

The petitioner stated that he clearly understood the charges he was facing; however, he "never knew the laws about the charge" or how serious the charges were. The petitioner said that at that time he did not really know what a trial was. While in jail, he was advised by other inmates that if he were innocent of the charges he should "take it to trial." The petitioner said that trial counsel did not prepare him for trial. Specifically, the petitioner recalled that the inmates told him he needed to wear a suit and pick a jury. When he asked counsel about the inmates' advice, trial counsel told him that he did not have to wear a suit and that picking a jury did not matter. The petitioner stated that trial counsel tried to force him to understand what was happening, but he went about it "the wrong way." The petitioner said, "You don't pressure nothing on me to try to make me understand when I know I couldn't understand." The petitioner asserted he tried to tell his story to trial counsel, but counsel did not believe him and told him that no one else would believe him. The petitioner said that he was frustrated and confused.

The petitioner stated that he and trial counsel never discussed what his defense at trial would be. Trial counsel told the petitioner that he was facing a sentence of fifty or sixty years; the petitioner did not want to face such a lengthy sentence. A week before trial, the petitioner rejected an offer of fifteen years because it was too much time to serve for something he had not done. The petitioner testified that trial counsel became angry when he rejected the offer.

On the day of trial, trial counsel came to the petitioner with the "same plea offer as before" and advised him not to go to trial. Based upon trial counsel's assurance that he could "make parole," the petitioner agreed to plead guilty to what he believed was an eight-year sentence. When the petitioner arrived at the penitentiary, he discovered that he had received a thirteen and one-half year sentence on each charge and that he would be eligible for release only after serving eighty-five percent of the sentence.

The petitioner acknowledged that he may have told the trial court during the plea hearing that he understood the proceedings, but he maintained that he had not really understood what was happening. The petitioner recalled that at one point during the guilty plea hearing, he and trial counsel went to the back of the court room. The petitioner said that trial counsel told him:

> [Y]ou don't need to do this. I care about you, man, you got your whole life ahead of you. And, he brought this other attorney in. . . . But he was telling me, he said . . . [the judge] will give you all that time if you sign for it, you don't need to do that. And, so, that's when my attorney left the room. I don't know what he, he came back with some papers in this hand. I guess that was the same papers. And, he was saying that he was going to help me. So, that's when I signed the papers, when he was saying something about eight years and make parole.

The petitioner said he now realizes that by pleading guilty to especially aggravated robbery, he is not eligible for parole.

The petitioner said that part of his confusion was caused by an error in the judgment forms. Specifically, one of the judgments of conviction reflected that he had a thirteen and one-half year sentence to be served at one hundred percent. However, the other judgment of conviction reflected that he was "mitigated" and was required to serve only twenty percent of the sentence. He said that he did not realize at the time that it was an error. The petitioner acknowledged that a corrected judgment was entered to reflect a mandatory one hundred percent service of both sentences.

The petitioner's mother, Linda Jones, also testified at the post-conviction hearing. She said that soon after the petitioner was charged, she spoke with the petitioner's juvenile court counsel. Juvenile counsel told Jones that she would obtain the petitioner's medical records, a medical evaluation, and his family history. However, juvenile counsel did not mention the petitioner's academic records.

After the petitioner's case was transferred to criminal court, Jones spoke with the petitioner's trial counsel one or two times, and she told him that the petitioner had "mental behavioral problems." Jones did not give either juvenile counsel or trial counsel the petitioner's medical or academic records. Jones explained that counsel told her that they would obtain the records.

The petitioner's juvenile counsel testified at the post-conviction hearing that she was appointed to represent the petitioner in July 2002. She said that the petitioner was held only about ten days prior to his transfer to criminal court. Juvenile counsel acknowledged that mental retardation is a factor the juvenile court considers when determining whether a transfer should be made. She said that an IQ of 60 is considered "mildly retarded," while an IQ of 80 is considered to be "low functioning." Juvenile counsel recalled that she spoke with the petitioner's mother; however, she could not recall whether the petitioner's mother brought her the petitioner's academic records. Juvenile counsel stated that usually, if a parent is concerned about a juvenile's level of functioning, the parent will bring her the juvenile's academic records. Juvenile counsel stated that she believed during the course of her representation she had reviewed "all" of the petitioner's "records" and had spoken with the prosecutor, police, and the petitioner's parents.

Juvenile counsel stated that she could not specifically remember some aspects of the petitioner's case because her case records had been shredded. However, she maintained that if the petitioner's mother had brought her a copy of the petitioner's academic records or had made her aware of the petitioner's low IQ, then juvenile counsel would have made the juvenile court aware of the information. She stated that if she knows a juvenile is in special education classes, she obtains their academic records. Juvenile counsel opined that an IQ of 60 could have prevented the petitioner's transfer to adult criminal court. However, she noted that a low IQ, standing alone, might not be enough to warrant commitment.

Juvenile counsel stated that the petitioner chose not to testify in juvenile court. She said that juveniles typically do not testify at transfer hearings, opining that their testimony could be used against them in criminal court. When asked, juvenile counsel acknowledged that Tennessee Code Annotated section 37-1-134 provides that statements made by a juvenile during a transfer hearing are not admissible against a juvenile in criminal court. Juvenile counsel stated that she was sure that she had advised the petitioner of his right to appeal the juvenile court's transfer order. Regardless, juvenile counsel maintained that she presented at the transfer hearing all of the information available to her.

Trial counsel testified that in March 2003, he was appointed to represent the petitioner. Trial counsel asked for an investigator to be appointed, and the trial court granted the request. Trial counsel said that he filed discovery motions and reviewed all the discovery materials. Trial counsel recalled that he met with the petitioner approximately once every two months during the one and one-half years of his representation. Trial counsel maintained that the petitioner's role as the shooter was never disputed. Moreover, the petitioner admitted the robbery and acknowledged that he shot the victims. However, the petitioner told counsel that another juvenile named "Kool-Aid" participated in the offense and directed him to shoot the victims. "Kool-Aid" told the petitioner that if he did not shoot the victims, "Kool-Aid" would shoot him. The petitioner was unable to provide any information leading to the identity or whereabouts of "Kool-Aid."

Trial counsel recalled that although the petitioner did not appear to be highly intelligent, he did not recall the petitioner "as being handicapped." Nevertheless, trial counsel requested that the petitioner undergo a mental evaluation. The petitioner was originally sent to Midtown Mental Health Center and later to Middle Tennessee Mental Health Institute. Evaluations from both facilities concluded that the petitioner was competent to stand trial and that an insanity defense could not be supported. Further, the petitioner did not meet the standards for judicial commitment.

Trial counsel recalled that he spoke with Jones several times during his representation of the petitioner. Counsel stated that they may have discussed mental health concerns, but Jones' primary focus was the petitioner's bail. Trial counsel said that Jones wanted to hire a family criminal defense attorney, but the hiring of alternate counsel never materialized.

Trial counsel testified that the State originally offered a plea agreement providing for a total effective sentence of twenty-five years to be served at eighty-five or one hundred percent. Negotiations continued, and the State continued to lower the total effective sentence from twenty to fifteen years. Trial counsel testified that the petitioner's trial was set for Monday, September 27, 2004. On that date, the State made another offer of thirteen and one-half years. Trial counsel told the petitioner that it was very likely he would be convicted at trial and could face an effective sentence of forty years with mandatory service of eighty-five percent.

Trial counsel discussed the plea agreement and the trial with the petitioner. He also brought in another experienced attorney to discuss options and likely outcomes with the petitioner. The petitioner seemed to understand the discussions. Trial counsel said that he remained calm and did

not raise his voice during his discussions with the petitioner. Trial counsel recommended that the petitioner accept the plea agreement. When the petitioner realized that trial was imminent, he became more willing to accept the plea agreement. Trial counsel advised the petitioner that even after serving eighty-five percent of his sentence, he would still be a young man when he was released.

Trial counsel recalled that the petitioner said that he pled guilty because he was guilty and because he did not want to serve forty or fifty years in the penitentiary. The petitioner agreed to accept the offer recommending the thirteen and one-half year sentences. Trial counsel told the petitioner that he would have to serve a minimum of eighty-five percent of the sentence in confinement before becoming eligible for parole. Trial counsel said that he never told the petitioner that he would serve only twenty percent of his sentence. The petitioner understood that he would have to serve one hundred percent of his sentence in confinement, with a possible reduction to eighty-five percent. Trial counsel stated that he had mistakenly marked on one of the petitioner's judgments of conviction that he would have to serve twenty percent of the sentence in confinement. Trial counsel admitted that the judgment form could have been confusing. However, trial counsel noted that while the petitioner was on the stand at the plea hearing, he had questions about a possible fifteen percent reduction in his sentence. Counsel recalled that the trial court took a break and allowed trial counsel to have additional discussions with the petitioner to ensure that he understood the plea agreement.

Trial counsel thought that accepting the plea agreement "was the best decision [the petitioner] ever made in his life." He recalled that the petitioner did not know "Kool-Aid's" real name or where he lived and could not provide a description of him. The investigator's attempts to find "Kool-Aid" were unsuccessful. Thus, trial counsel concluded that for the petitioner to say "Kool-Aid directed him to do this when Kool-Aid was not to be found was a hopeless case."

Trial counsel recalled discussing the petitioner's IQ and said that he thought he remembered it being as low as 60. Counsel explained that a defense of diminished capacity could have been explored further; however, based upon the petitioner's version of events the focus was on the defense of duress. Trial counsel opined that he would not have changed the way he dealt with the petitioner if he had possessed the petitioner's academic records. Trial counsel said, "Had I known of his school records, I don't think that I would have spent any more time because there was just no more time to be spent."

Based upon the foregoing, the post-conviction court found that the petitioner had not met his burden of proving that juvenile counsel or trial counsel had been ineffective. The court further found that the petitioner's guilty pleas were knowingly and voluntarily entered. On appeal, the petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

## A. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Because a petitioner must prove both prongs of the test to be entitled to post-conviction relief, an insufficient showing of either prong is sufficient basis to deny relief; in fact, this court need not address both components if there is an insufficient showing of one component. Goad, 938 S.W.2d at 370. Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985).

The petitioner first argues that his juvenile counsel was ineffective by failing to present evidence of his mild mental retardation at the transfer hearing and by advising him that he could not testify at the transfer hearing because the testimony could be used against him in criminal court. First, we note that the petitioner failed to include a transcript of the transfer hearing in the record for our review. See Tenn. R. App. P. 24(b). Furthermore, at the post-conviction hearing, juvenile counsel testified that she could not recall specifically what occurred at the transfer hearing.

-7-

However, she stated that if the petitioner or his mother had made her aware of the petitioner's mental retardation, she would have made the juvenile court aware of the issue. Based upon the record before us, we cannot deduce what evidence was before the juvenile court at the transfer hearing. Regardless, the record reflects that the juvenile court had before it evidence regarding the petitioner's extensive record of juvenile offenses and concluded that based upon the statutory criteria, the petitioner should be transferred to criminal court. Based upon the record before us, the petitioner has failed to establish that counsel was ineffective.

Additionally, the petitioner complains that juvenile counsel erroneously advised him that he should not testify at the transfer hearing because his testimony could be used against him in adult criminal court. However, the petitioner failed to show how he was prejudiced by not testifying. Accordingly, the petitioner is not entitled to relief on this issue.

The petitioner contends that trial counsel was ineffective for failing to accurately inform him about the amount of time he would have to serve before becoming eligible for parole. The post-conviction court discredited the petitioner's testimony, finding that he was well-informed of the sentence he would receive. Moreover, we note that transcript of the guilty plea hearing belies the petitioner's contention that he was not informed of the amount of time he would have to serve before release eligibility. Therefore, we conclude that the petitioner has failed to establish that counsel was ineffective in this regard.

## B. Knowing and Voluntary Guilty Pleas

The petitioner also argues that as a result of the alleged deficiencies of counsel, his pleas were not knowingly and voluntarily entered. In determining whether a petitioner's guilty plea was knowing and voluntary, this court must look at the totality of the circumstances. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). "This court is bound by the post-conviction court's findings unless the evidence preponderates otherwise." Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self incrimination, the right to confront witnesses, and the right to a trial by jury. See Boykin v. Alabama, 395 U.S. 238, 243, 89 S. Ct. 1709, 1712 (1969). Therefore, in order to comply with constitutional requirements, a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 164 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. See Boykin, 395 U.S. at 244, 89 S. Ct. at 1712.

To pass constitutional muster, a guilty plea must be made voluntarily, understandingly, and knowingly. Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Boykin, 395 U.S. at 244, 89 S. Ct. at 1713); see also State v. Mackey, 553 S.W.2d 337, 341 (Tenn. 1977). To

determine the voluntariness and intelligence behind a guilty plea, the court must look to various circumstantial factors, i.e.,

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

Initially, we note that the petitioner never testified that, but for trial counsel's errors, he would not have entered the pleas. Moreover, as we earlier noted, the petitioner was repeatedly informed of the sentences to which he was pleading. The petitioner was informed of the rights he was waiving by pleading guilty, and he was represented by competent counsel. Additionally, the record reflects that both counsel and the trial court took precautions to ensure that the petitioner understood the plea agreement. Accordingly, we conclude that the petitioner's pleas were knowingly and voluntarily entered.

### III.  Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE